# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

DeWAYNE DERKSEN,

        Plaintiff,

v.

                                   **MEMORANDUM OF LAW**
                                      **AND ORDER**
                         **Civil No. 04-3411 (MJD/SRN)**

CNA GROUP LIFE ASSURANCE
COMPANY, and its Successors,

        Defendants.

---

David W. Larson, Martin & Squires, Counsel for Plaintiff.

Doreen A. Mohs, Rider Bennett, LLP, Counsel for Defendants.

---

## I.      INTRODUCTION

     This matter is before the Court on the Parties' Cross Motions for Summary Judgment [Doc. Nos. 50 and 58]. Oral argument was heard on July 27, 2005. With the Court's permission, Plaintiff's counsel submitted a post-hearing letter brief that was received on August 1, 2005.

## II.     BACKGROUND

     This case arises under the Employee Retirement Income Security Act of

1

1974 ("ERISA"), 29 U.S.C. §§ 1101, et seq. Specifically, Plaintiff's claim is brought

under 29 U.S.C. § 1132 and seeks benefits under the plan at issue and an

injunction to reinstate Plaintiff's policy with Defendants. Plaintiff DeWayne

Derksen filed suit against Defendant CNA in July 2004 after CNA denied Derksen's

claim for long term disability ("LTD") benefits based on Derksen's assertion that

he is disabled due to diabetes.

     A.    **The Plan**

     Under the plan at issue ("the Plan"), a participant is entitled to benefits

when he is disabled. A participant is disabled when the participant satisfies either

the Plan's Occupation Qualifier or Earnings Qualifier. Under the Occupation

Qualifier,

> [d]isability means that Injury or Sickness causes physical or mental
> impairment to such a degree of severity that You are: 1) continuously
> unable to perform the Material and Substantial Duties of Your
> Regular Occupation; and 2) not Gainfully Employed.

(AR 008) (emphasis omitted). Under the Earnings Qualifier, a Plan participant

> may be considered disabled . . . in any month in which You are
> Gainfully Employed, if an Injury or Sickness is causing physical or
> mental impairment to such a degree of severity that You are unable
> to earn more than 80% of Your Monthly Earnings in any occupation
> for which You are qualified by education, training or experience. . . .
> You are not considered to be Disabled if You are able to earn more
> than 80% of Your Monthly Earnings.

(Id.) (emphasis omitted). The Plan defines "gainfully employed" in the following

way:

> Gainful Employment or Gainfully Employed means the performance of any occupation for wages, remuneration or profit, for which You are qualified by education, training or experience on a full-time or part-time basis, for the Employer or another employer, and which We approve and for which We reserve the right to modify approval in the future.

(AR 024) (emphasis omitted). The Plan defines "Generally Accepted Medical Practice" as "care and treatment which is consistent with relevant guidelines of national medical, research, and health care coverage organizations and governmental agencies." (AR 025.) To prove disability, claimants must prove that the treatment they are receiving is appropriate care under these guidelines. (AR 020.)

**B.    Facts**

Derksen is a sixty-two year old insurance broker selling "sophisticated commercial insurance products and servicing the resulting accounts." (Pl Mem. Supp. Mot. Summ. J. at 5.) Derksen has several degrees and certifications, and in his work he meets with corporate officers and directors on a regular basis. According to Derksen's employer, the essential duties and responsibilities of Derksen's job include meeting quotas for selling insurance, providing service to current clients, and maintaining certain education levels regarding insurance products. (AR 226, 231.) This work requires Derksen to drive all over the Twin Cities, and sometimes outside the Metro area. (AR 226.) In his moving papers, Derksen describes his job as "crisis driven," and states that the job requires long

3

hours, routinely in excess of sixty hours a week. To maintain his level of commissions, Derksen's employer confirmed that Derksen would generally need to work sixty hours a week. (AR 226.)

In 1998, Derksen began using insulin to control his diabetes. Derksen applied for LTD benefits in June 2003, claiming that he was disabled due to his disease. According to Derksen, the intense monitoring and treatment required to control his diabetes reduced his ability to perform his job as an insurance broker and thus reduced his income. In addition, Derksen noted that he was unable to continue working as a "functioning producer" in a full time capacity. (AR 255.) Derksen stated that he believed he had a diminished ability to work, and that his income would be affected after April 1, 2003 because as he "evolv[ed] a more strenuous insulin regimen, [his work] capacity is/was reduced." (Id.)

Along with his claim, Derksen submitted a form from his treating physician, Dr. Beck. Dr. Beck stated that Derksen has diabetes mellitus and "takes insulin eight times/day/rigid meal plan." (AR 254.) The form requests the "Date Total Disability Commenced." Dr. Beck responded "60% work 40% disabled" without providing a date. (Id.) Dr. Beck responded to the form query, "Can patient resume full duties upon return to work?" by checking the "No" answer box and stating, "60% work due to intense treatment of diabetes." (Id.)

Upon receiving Derksen's claim, CNA contacted Derksen's employer and

requested clarification of some information. The employer responded, and stated that Derksen was in control of his own work hours, but had begun working less than the average sixty hours a week normally worked by insurance brokers at Derksen's commission level, and that Derksen's job responsibilities and commissions were reduced around April 1, 2003. (AR 226.) The employer noted a decline in Derksen's un-reimbursed mileage expenses, client calls, and appointments. (AR 227.) The employer further stated that while most average insurance brokers work sixty hours per week, Derksen had additional duties as a specialist in certain areas in addition to his broker duties.

On June 13, 2003, CNA's Disability Specialist Ameena Powell interviewed Derksen. (AR 243-48.) During this interview, Derksen stated that he checked his blood sugar levels often and that he cut his work hours from sixty to thirty-five to forty hours per week. Derksen admitted that although Dr. Beck recommended he cut back from a sixty-hour work week, Dr. Beck had not specifically stated how many hours Derksen should work. (AR 244.) Derksen described his job duties as "typing on the computer, information gathering CRT, telephone and communication, appointment placements, [and] [d]riving." (AR 245.) Derksen stated that he began to do less outside calling and appointments because of his reduced hours, and that more of his duties were performed in the office. Derksen also stated that some of his work had been moved from him to other sales people,

and that he did not attend as many board meetings as he used to because people got "turned off" by his blood testing and insulin injections. (Id.) Derksen further stated that he was currently waking up an hour later in the morning and was no longer working on weekends on a regular basis. (AR 246.)[1]

In an August 29, 2003 letter, Dr. Beck told CNA that he advised Derksen that cutting his hours to half-time or thirty hours a week "would be more appropriate at [Derksen's] age, related to his diabetes, and other medical issues." (AR 208.) Dr. Beck also stated that he "would certify from a medical standpoint that [Derksen] needs to cut back to half-time to continue his intensive therapy." (Id.; AR 205.) Dr. Beck further stated that Derksen "certainly feels much better working few hours," and noted that Derksen's prior medical records did not mention a reduction in work because those documents dealt primarily with Derksen's medical condition. (AR 208-09.)

A November 2001 medical record shows that Derksen was checking his blood sugars from eight to ten times a day, and that Dr. Beck apparently changed Derksen's treatment protocol at this time. (AR 258-59.) In an October 21, 2002

---

[1]Derksen asserts that to the extent CNA relies on this interview to support its arguments, that reliance is misplaced because when Ms. Powell wrote down a "No" as Derksen's response to a question, it did not mean that Derksen did not answer the question more fully than that. According to Derksen, it means that Powell did not record Derksen's entire response. (Pl. Mem. Opp. Def. Mot. Summ. J. at 6.) As far as the Court can tell, there is no basis for this theory. Therefore, to the extent the Court considers this document, it will take it at face value.

medical record, Dr. Beck noted that Derksen had become "almost a 'fanatic'"
about his insulin dosing, that Derksen was taking about eight doses of insulin a
day, and that Derksen felt "remarkably well" and had control of his blood sugars.
(AR 256.) Dr. Beck also noted that due to Derksen's intensive treatment of his
diabetes, Derksen was not able to work "fulltime [sic] like he did before because of
his intensive treatment" and was working "about 60%." (Id.)

    Derksen's medical records indicate that in November 2002, he was checking
his blood sugar as often as twenty times a day. (AR 121.) In January 2003,
Derksen had reduced his testing to six to eight times per day. (AR 125.) Dr. Beck
noted that Derksen had a "slight disability" due to his diabetes because he was
"unable to work as long a hours [sic] on his diabetic schedule with his insulin
therapy and eating pattern." (Id.) At that time, Dr. Beck noted that the high stress
of Derksen's job was making Derksen's diabetes worse, but that the change in
work schedule and current insulin dosing had led to dramatic improvement in
Derksen's health. (Id.) In June 2003, Derksen was still testing seven to ten times a
day. (AR 129.)

    Derksen visited Dr. Beck on August 21, 2003 "for a consultation regarding
his request for disability [benefits]." (AR 123.) At this visit, Dr. Beck noted that
Derksen "has seriously looked at the possibility of cutting back his hours because
he is currently taking Lantus insulin twice a day and Humalog up to 7or 8 doses

per day depending on his blood sugars." (Id.) In this same report, Dr. Beck stated, "I will be writing a letter to [] CNA . . . regarding the need for [Derksen's] half-time work, [and] regarding the stress of his job in conjunction with his frequency of insulin injections in control of his diabetes." (Id.)

On October 14, 2003, CNA sent Derksen's documentation for review by an independent medical examiner, Dr. Truchelut. Dr. Truchelut was charged with interpreting the evidence in Derksen's file regarding Derksen's restrictions or limitations. (AR 110.) In addition, Dr. Truchelut was asked to address whether Derksen's documentation supported a worsening of Derksen's level of functioning that would preclude his ability to perform his full time work activities beginning October 22, 2002 or later, and for how long. (Id.)

On October 19, 2003, Dr. Truchelut issued a report stating that although Derksen's record did not support a worsening of his level of functioning that would preclude working full time, taking glucose measurements at least every two hours and taking insulin eight to ten times a day "would present a challenge. Thus, a reduction in work hours to accommodate this might be appropriate." (AR 103.) Dr. Truchelut also stated that Derksen did not have any major complications from his diabetes, and that he would discuss the situation with Dr. Beck and amend his report if necessary. (Id.)

Dr. Truchelut spoke with Dr. Beck on October 19, 2003, and asked Dr. Beck

8

if Derksen's intense monitoring was "absolutely necessary and ordered by his

physicians." (AR 104.) Dr. Truchelut opined that if Derksen's intense routine was

necessary and ordered by a physician, "it could be viewed as interfering with some

aspect of his work activities." (Id.) Two days later, Dr. Truchelut amended his

report in the following way:

> After my discussed [sic] with Dr. Beck, it is my impression that the
> claimant is not physically limited from performing the demands of his
> own occupation. His intensive regimen of testing and insulin shots is
> largely self imposed, and while it might present difficulties for him, it
> should not preclude his occupational activities.

(AR 105.) Dr. Truchelut noted that Dr. Beck had not told Derksen to monitor his

condition "exactly in this fashion," and that Derksen had "taken it upon himself" to

adopt the intense monitoring system he was using. (Id. at 104.) According to Dr.

Truchelut, Dr. Beck said that while Derksen's monitoring system was not the

normal standard of care, Derksen was not wrong to monitor his condition so

closely, in spite of the fact that Dr. Beck felt that Derksen's condition did not

preclude Derksen from performing his duties as an insurance broker. (Id.) Dr.

Beck explained to Dr. Truchelut that Derksen had been a "nonbeliever'" in

intensive treatment and monitoring until "about a year and a half ago when he

had an epiphany of sorts about his condition and started to aggressively monitor

and control his blood sugars." (Id.)

Dr. Beck and Dr. Truchelut apparently agreed that Lantus, one of Derksen's

9

insulin medications, is usually taken once a day, rather than the two times a day Derksen took the medication; and that the Humalog pen is usually used up to four times a day, rather than the seven to eight times a day Derksen was using it. (AR 105.) Dr. Truchelut concluded that Derksen was able to perform the demands of his occupation, and that although Derksen's self-imposed treatment regimen may cause Derksen difficulties, it did not prevent Derksen from doing his job. (Id.)

CNA denied Derksen's claim on November 7, 2003 and informed Derksen of his right to appeal the decision, including the right to present new medical evidence for consideration. (AR 097-099.) CNA's denial letter briefly described the information it had reviewed; summarized Dr. Truchelut's findings; explained that Dr. Truchelut had spoken with Dr. Beck and summarized Dr. Truchelut's version of that conversation; and stated that although Derksen's treatment, testing, and management of his diabetes "may interfere with the work activity, in general, insulin regimens and blood glucose monitoring are designed to be portable and allow integration with . . . work activities." (AR 098.) CNA concluded that Derksen's medical record did not "support an impairment in function that would continuously prevent [Derksen] from performing the substantial and material duties of [his] occupation." (Id.)

Derksen appealed CNA's decision pro se and included some new evidence with his appeal. This evidence included a letter containing two examples of times

when his work schedule and work-related stress clashed with his monitoring, insulin dosing, and eating schedules; copies of emails documenting the transfer of his clients to other agents; and a prescription for test strips stating that the strips were to be used "as directed up to ten times per day." (AR 065-069.) In his appeal letter, Derksen explained that his inability to carry a full work load had caused a decrease in his income, and noted that such things as testing and eating in his car, situations that arise because of his work/treatment schedules, are "NOT appropriate" to maintaining his health care regimen. (AR 066) (emphasis in original.) Derksen also alleged that CNA's version of the conversation between Dr. Beck and Dr. Truchelut was "at variance." (AR 065.)

On January 21, 2004, CNA informed Derksen that the information he submitted on appeal did not change the Claims Area's decision and, therefore, the file was being forwarded to the Appeals Area for its review. (AR 063.) On February 20, 2004, CNA again denied Derksen's request for benefits. (AR 060.) CNA acknowledged that the records reflected that Derksen reduced his work hours to accommodate treatment for his diabetes, but stated that the medical documentation indicated that Derksen's work reduction and treatment regimen was self-imposed, and was not the prescribed standard of care for his condition. (Id.) Thus, the Appeals Area also concluded that Derksen's condition was under control and did not constitute a functional impairment that precluded him from

full time work. (AR 061.) Derksen engaged counsel and filed the instant lawsuit on July 26, 2004.

Derksen continued to see Dr. Beck during the pendency of his application for benefits and his appeal. Dr. Beck generated four reports during this time. These reports were never submitted into the administrative record.

A September 2003 medical record notes that Derksen was working half time at Dr. Beck's request, and that doing so was necessary not only to stave off serious complications from diabetes such as ischemic heart disease and neuropathy, but also for Derksen's current general health. (ARS 266.) On October 27, 2003, Dr. Beck's records indicate that he spoke on the telephone with a physician from CNA, and that he explained to the physician that although Derksen had taken more medication than prescribed in the past, he was now down to "normal dosing;" that it was still difficult for Derksen to give his job the necessary time; and that Derksen may need to work in a different position in order to maintain full time status. (ARS 267-68.)

On January 29, 2004, when Derksen's claim was on appeal to CNA, Dr. Beck noted that Derksen had a hard time maintaining a consistent four-times-a-day testing routine because of his work schedule, that his job had necessitated the unusual frequency of his testing, and that Derksen could not continue his current work schedule. (ARS 269.) On March 16, 2004, after CNA had rendered its final

decision, Dr. Beck encouraged Derksen to change his workload so that he could

pursue a more traditional standard of care for his diabetes and avoid

unpredictable eating patterns and the resulting blood sugar levels. (ARS 270-71.)

## III.    DISCUSSION

### A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue of

material fact. <u>Id.</u> at 323.

### B.    <u>Standard of Review</u>

A denial of benefits challenged under § 1132 must be reviewed for abuse of

discretion when the benefit plan gives the administrator or its fiduciary the

authority to determine eligibility or to construe the terms of the plan. <u>Firestone</u>

<u>Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109-13 (1989); <u>Woo v. Deluxe Corp.</u>,

144 F.3d 1157, 1160 (8th Cir. 1998). The benefit plan at issue in this case gave

CNA discretionary authority to interpret the terms of the Plan.

Under certain circumstances, courts may apply a less deferential standard of

review. In order to obtain a less deferential standard of review, a plaintiff must

present probative evidence demonstrating that "(1) a palpable conflict of interest or serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [the plaintiff]." Id. (citing Buttram v. Central States, S.E. & S.W. Areas Health & Welfare Fund, 76 F.3d 896, 900 (8th Cir. 1996)). To satisfy the second prong of the test, a plaintiff must show that the conflict or irregularity has some connection to the plan's decision. Id. (citation omitted). This prong presents a "considerable hurdle" for plaintiffs, and in order to overcome the hurdle, a plaintiff's evidence "must give rise to 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" Barnhart v. Unum Life Ins. Co., 179 F. 3d 583, 588, 589 n.9 (8th Cir. 1999) (citation omitted).

Once a plaintiff has presented evidence justifying a less deferential standard, the court must apply a "sliding scale" approach that requires the court to conduct an abuse of discretion analysis taking into consideration the conflict or procedural irregularity. Woo, 144 F.3d at 1161. Under this approach, the evidence supporting the benefit plan's decision must increase in proportion to the seriousness of the conflict or procedural irregularity. Id. at 1162 (citation omitted).

When analyzing an ERISA plan, the Court must begin by examining the language of the plan. Bond v. Cerner Corp., 309 F.3d 1064, 1067 (8th Cir. 2002).

14

In addition, the Court must give the plan language its "common and ordinary meaning as a reasonable person in the position of the [plan] participant, or the actual participant, would have understood the words." <u>Costley  v. Thibodeau, Johnson & Feriancek, PLLP</u>, 259 F. Supp. 2d 817, 830 (D. Minn. 2003) (quoting <u>Melvin v. Yale Indust. Prod., Inc.</u>, 197 F.3d 944, 947 (8th Cir. 1999)) (brackets in original). The Court should interpret plan terms to conform to the "legitimate expectations" of the plan's participants. <u>Pralutsky v. Metropolitan Life Ins. Co.</u>, 316 F. Supp. 2d 840, 850 (D. Minn. 2004) (quoting <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 443 (3d Cir. 1997)).

CNA argues that its decision should be reviewed under the abuse of discretion standard because the Plan gives the administrator discretion to interpret the Plan's terms and because CNA established proper procedures to evaluate Derksen's claim. CNA further asserts that even under a less deferential sliding-scale standard of review, its decision is supported by substantial evidence. CNA notes that its fiduciary duties extend primarily to the Plan and require it to act in the best interest of all Plan participants, which includes the duty to pay claims only when there is sufficient proof of disability.

### 1.  **Whether Conflicts of Interest Justify a Less Deferential Standard of Review**

When an insurer is also the plan administrator, something like a rebuttable conflict exists. <u>Phillips-Foster v. UNUM Life Ins. Co.</u>, 302 F.3d 785, 795 (8th Cir.

2002) (citation omitted). However, not every funding conflict evidences a palpable conflict of interest. Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1197(8th Cir. 2002) (citation omitted). The presumption can be ameliorated by other factors such as equally compelling long-term business goals and the fact that plan administrators' fiduciary responsibilities extend to everyone covered by the plan. Barnhart, 179 F.3d at 589; Farley v. Arkansas Blue Cross & Blue Shield, 147 F.3d 774, 777 (8th Cir. 1998). ERISA actually contemplates the use of fiduciaries who might not be entirely neutral, id. at 776, and requires benefit plan fiduciaries to consult with appropriate health care professionals. 29 C.F.R. § 2560.503-1(h)(3)(iii);(4); Coker v. Metropolitan Life Ins. Co., 281 F.3d 793, 800 (8th Cir. 2002) (finding that opinions of two reviewing physicians, engaged by defendant insurance company to review plaintiff's claims, were sufficiently thorough so as to survive abuse of discretion review).

Derksen argues that Dr. Truchelut is CNA's "kept doctor," and because of that, Dr. Truchelut's conclusions are suspect. (Pl. Mem. Opp. Def. Mot. Summ. J. at 7-8.) For support, Derksen cites two documents filed under seal that show the number of claims Dr. Truchelut reviewed for CNA from October 1999 to October 2003, and the amount of money he was paid for the reviews. Derksen argues that this evidence proves that Dr. Truchelut was lying when he characterized the conversation he had with Dr. Beck regarding Derksen's benefit claim.

16

CNA argues that there is no evidence of any conflict of interest, and that even if CNA pays Dr. Truchelut for his services, that alone does not justify a heightened standard of review. In addition, CNA argues that it is CNA, not Dr. Truchelut, that is charged with making disability determinations, and that Dr. Truchelut's opinion is but one piece of evidence CNA used in reaching its decision.

CNA serves as both the insurer and the administrator of the Plan. Thus, there is a presumptive conflict of interest. However, Derksen fails to demonstrate how this conflict affected CNA's decision in his case or resulted in a breach of CNA's fiduciary duty.

In addition, there is no irregularity in CNA's hiring Dr. Truchelut to review Derksen's claim. CNA's use of Dr. Truchelut is the kind of medical advice contemplated by ERISA, and it is axiomatic that someone in this position will be paid for his services. Thus, any perceived conflict of interest on Dr. Truchelut's part is without merit and CNA's hiring Dr. Truchelut does not justify a sliding scale standard of review.

      **2.**    **<u>Whether CNA Failed to Properly Notify Derksen That It Took Issue With His Treatment Plan</u>**

Under ERISA, a plan administrator must provide a claimant with notification of any adverse benefit determination. The notification must include, <u>inter</u> <u>alia</u>, the following:

     (i)   The specific reason or reasons for the adverse determination;

     (ii)   Reference to the specific plan provisions on which the determination is based; [and]

     (iii)   A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.

29 C.F.R. § 2560.503-1(g)(i)-(iii). Notifications must contain "timely and specific"

explanations for benefits denials. Marlot v. Alliant Tech., Inc., 146 F.3d 617, 620

(8th Cir. 1998). This notification is required to provide claimants with enough

information to adequately prepare for an administrative review. Davidson v.

Prudential Ins. Co., 953 F.2d 1093, 1096 (8th Cir. 1992). The reasons for denial

must be stated in a manner that the claimant can understand, and the plan must

provide the claimant a full and fair review of its decision to deny benefits. 29

U.S.C. § 1133.

     Furthermore, a benefit plan may not offer new reasons for its decision

during the pendency of litigation related to the plan's denial of benefits. Wuollet

v. Short-term Disability Plan of RSKCO, 360 F. Supp. 2d 994, 1010 n.13 (D. Minn.

2005) (noting that the plan at issue never asserted the reasons cited in its court

documents in any of its denial letters); accord Marlot, 146 F.3d at 620 (holding

that benefit plans may not "sandbag" claimants with "after-the-fact plan

interpretations devised for the purposes of litigation"). However, an initial benefit

denial need not be extensive. <u>Kinkead v. Southwestern Bell Corp. Sickness &</u>

<u>Accident Disability Benefit Plan</u>, 111 F.3d 67, 69 (8th Cir. 1997).

> At this early stage of the claim process, administrative efficiency is a
> virtue, so long as disappointed claimants are advised of their right to
> pursue the plan's review procedures. Therefore, the initial claim
> denial need not be extensive, provided it explains the basis for the
> adverse initial decision sufficiently to permit the claimant to prepare
> an informed request for further review.

<u>Id.</u> In its final denial letter, CNA stated that Derksen's claim was being denied for

the following reasons:

> [Y]our current treatment regimen has not been recommended by
> your treating physician nor is it the prescribed standard of care for
> your condition. The treatment plan you maintain is self imposed and
> certainly may cause some difficulty in your ability to maintain a full
> time work schedule, again, however, with a standard treatment plan
> you maintain the ability to perform your occupational work activity
> on a full time basis.

(AR 060.) Derksen states that he was not given this reason in the initial denial.

Derksen argues that had he known his claim was being denied because his

treating physician did not approve his treatment plan or because his treatment

regimen was self-imposed, he could have addressed those issues during his

administrative appeal. Derksen also argues that he and Dr. Beck had no

opportunity to respond to Dr. Truchelut's version of the conversation between Dr.

Beck and Dr. Truchelut.

CNA responds that its initial denial letter met the <u>Kinkead</u> standard and gave Derksen sufficient notice of the reasons for its denial. CNA also argues that the reasons stated in the initial denial are consistent with the reasons stated in the final denial.

The Court finds that Derksen's argument that he did not have an opportunity to rebut Dr. Truchelut's version of the phone conversation between Dr. Truchelut and Dr. Beck is without merit. CNA's denial notice specifically mentions that the two doctors discussed Derksen's condition (AR 098), so Derksen was on notice that he should rebut the recital of the conversation, if necessary. Moreover, Derksen did respond to Dr. Truchelut's version of the conversation. In the letter Derksen submitted with his appeal, he stated that Dr. Truchelut's and Dr. Beck's characterizations of the conversation were "at variance," but did not mention what parts of the conversation were at issue or provide an alternative version of the conversation. (AR 065.)

Notwithstanding the above, the Court finds that CNA's original denial letter was deficient. CNA was required to state its denial in a manner Derksen could understand and in a manner that allowed Derksen to adequately prepare for an administrative review. Although an initial denial need not be very detailed, CNA's denial did not sufficiently permit Derksen to prepare an informed request for administrative review. The denial did not properly convey to Derksen that his treatment regimen was at issue. The denial stated that the evidence "does not support that you are physically limited;" that "you wished to cut back your hours;" that the record does not "document a

reduction in your general functional abilities on a continuous basis;" and that "testing, treatment, diagnosis, and management of a medical condition does not confirm an inability to perform your occupation or indicate a disabling impairment." (AR 098.) None of these reasons put Derksen on notice that his treatment regimen would be the ultimate basis for denial of his claim. Thus, this notification failed to meet the standards set forth in the Regulations. This procedural irregularity satisfies the first prong of the Woo test. In addition, this irregularity resulted in a serious breach of the Plan administrator's fiduciary duty because it inhibited Derksen's ability to properly prepare for an appeal, thus satisfying the second prong of the Woo test.  CNA was relying on the same information both times it reviewed Derksen's claim, but found an entirely new basis for denial on appeal. With no mention of this reason in the initial denial, CNA's final decision was arbitrary, especially in light of CNA's reliance on the fact that Derksen submitted very little evidence on appeal.

> **3.**     **Whether CNA's Failure to Address Derksen's Claims Under the Earnings Qualifier Justifies a Less Deferential Standard of Review**

Derksen argues that CNA never evaluated his claim under the Earnings Qualifier. This qualifier was the original basis for Derksen's claim. (AR 255.)

CNA responds that it did address the Earnings Qualifier when it stated that Derksen failed to demonstrate he could not perform his duties on a full time basis, or keep his regular hours. In addition, CNA notes that both qualifiers require Derksen to prove he had a current severe impairment. Thus, since impairment is a threshold issue

under both qualifiers, CNA argues that the discussions of "impairment" in its denial letters sufficiently address both the Earnings Qualifier and the Occupation Qualifier.

In its denial, CNA was required to reference the specific Plan provisions upon which its decision was based. 29 C.F.R. § 2560.503-1(g)(ii). Contrary to CNA's argument that its references to "impairment" address disability claims under both qualifiers, the Court finds that CNA failed to clearly reference the Earnings Qualifier.

At the outset, the Court notes that CNA's denials do not clearly state what sections of the Plan it relies upon. However, although CNA failed to specifically cite either qualifiers or refer to specific Plan definitions, a reasonable reader can glean Occupation Qualifier language from the initial denial. CNA uses the phrases "performing the physical demands of your own occupation," "performing the substantial and material duties of your occupation," "reduc[ing] . . . general functional abilities on a continuous basis," and "ability to perform the job demands." (AR 098.) This language refers to the Occupational Qualifier, which contains the phrase "continuously unable to perform the Material and Substantial Duties of Your Regular Occupation." (AR 008.) There is nothing in the denial that refers to similar Earnings Qualifier language. Any reference to the Earnings Qualifier should include language regarding an ability to earn more or less than 80% of a claimant's usual income. No such references appear in the initial denial or the final denial. (AR 060-061, 097-099.) The Court assumes that if CNA meant to rely on the Earnings Qualifier, it would have referred to such language, since it had an obligation to do so. Derksen legitimately

expected that CNA would address his claim under the Earnings Qualifier since that this was the qualifier Derksen relied upon in his initial claim for benefits.

Moreover, CNA's current argument that its references to work schedules were sufficient to support an evaluation under the Earnings Qualifier is unavailing. The Earnings Qualifier does not mention work hours. Rather, the Earnings Qualifier only mentions "80% of . . . Monthly Earnings." (AR 008.) CNA's denial letters do not satisfy ERISA's requirement that it clearly state the policy terms upon which it relies. Thus, even assuming that CNA meant to base its denials on the Earnings Qualifier, the denial letters are insufficient. This procedural irregularity satisfies the first prong of the <u>Woo</u> test. In addition, this irregularity resulted in a serious breach of the Plan administrator's fiduciary duty because it provided Derksen only half of his proper review, a review that he paid for with higher monthly premiums and reasonably expected would occur. This irregularity prevented Derksen from properly addressing Earnings Qualifier issues on appeal, and resulted in CNA issuing an arbitrary decision.

   **4.    <u>Whether CNA Failed to Comply With Regulations When It Did Not Have an Independent Medical Examiner Review Derksen's Claim on Administrative Appeal</u>**

Under ERISA, when faced with a denial of benefits based on medical evaluations, ERISA plan fiduciaries must do the following:

> Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field

23

of medicine involved in the medical judgment. . . . [p]rovide[d] that the
health care professional . . . shall be an individual who is neither an
individual who was consulted in connection with the adverse benefit
determination that is the subject of the appeal, nor the subordinate of any
such individual.

29 C.F.R. § 2560.503-1(h)(3)(iii),(v); (h)(4). This regulation applies to all ERISA

disability claims filed on or after January 1, 2002. 29 C.F.R. § 2560.503-1(o).

CNA argues that it did not conduct a medical review on appeal because Derksen

did not submit any new information with his appeal that required medical evaluation.

According to CNA, the prescription for test strips to be used "up to ten times per day"

did not add to the body of medical evidence already in the record and did not trigger a

new medical review since it was consistent with the information previously examined

by Dr. Truchelut.

CNA further argues that it actually did have a separate fiduciary review

Derksen's claim on appeal. Specifically, CNA had Joye Kelly, whom CNA describes as a

"separate fiduciary from the initial fiduciary denying the claim" (Def. Resp. Pl. Mot.

Summ. J. at 17), review Derksen's benefit denial. For support, CNA cites cases in which

the courts found that insurers were not obligated to obtain independent medical

examinations because the medical evidence, on its face, was sufficient for the

administrator to make a decision. See Layes v. Mead Corp., 132 F.3d 1246, 1251-52;

Vasaas v. Hartford Life & Accident Ins. Co., 981 F. Supp. 1196, 1198-1200 (D. Minn.

1996).

The Court finds that CNA's failure to have an independent health care

24

professional review the record on appeal was a serious procedural irregularity that
resulted in the Plan administrator's breach of fiduciary duty. The cases decided
since 2002 when the "independent health care professional" regulation went into
effect all interpret the regulation narrowly and require an independent
evaluation. See Neiheisel v. AK Steel Corp., No. 103 CV 868, 2005 WL 1077593, at
*9-10 (S.D. Ohio Feb. 17, 2005) (unpublished opinion) (finding that having
physician upon whose opinion initial denial was based involved in the selection of
appeal health care professional called into question the independence of the
appeal health care professional and violated the Regulation); Krodel v. Bayer
Corp., 345 F. Supp. 2d 110, 115-17 (D. Mass. 2004) (finding that failure to seek
medical evaluation on administrative appeal violated the Regulation); Crespo v.
UNUM Life Ins. Co., 294 F. Supp. 2d 980, 995 (N.D. Ill. 2003) (finding that use of
in-house physician without expertise in fibromyalgia to review case on
administrative review did not satisfy the requirements of the Regulation);
Steinberg v. R.R. Maint. & Indust. Health & Welfare Fund, No. 03 C 4539, 2004
WL 1151619, at *4 (N.D. Ill. Apr. 13, 2004) (unpublished opinion) (finding
procedural irregularity when group health benefits plan submitted appeal records
to same company and same doctor that had denied claim originally). See also
Miles v. AIG Life Ins. Co., No. Civ. A. 04-1432, 2005 WL 1038668, at *8 (E.D. La.
Apr. 22, 2005) (unpublished opinion) (finding that life insurance company that

25

incorporated language of 29 C.F.R. §256.503-1(h)(3)(iii) into its policy failed to follow procedures when it did not obtain an independent medical evaluation on administrative appeal).

To that end, the Court finds unpersuasive <u>Moser v. CNA Group Life Assur. Co.</u>, No. CIV. 8-4-0410 FCD PAN, slip op. (E.D. Ca. Mar. 15, 2005), a case CNA first relied on during oral argument. <u>Moser</u> was decided after January 1, 2002, and although the insurer in the case did not have the record reviewed by an independent health care professional either initially or on appeal, the court affirmed the insurer's decision to deny the claimant benefits. <u>Id.</u> at 22. However, in that case there was no mention of 29 C.F.R. § 2560.503-1(h), most likely because the claimant's own statements demonstrated that he was not disabled. <u>Id.</u> at 15-17. CNA relies on the <u>Moser</u> court's statement that no medical evaluation was required because "CNA was not disputing the validity of the medical evidence." <u>Id.</u> at 15. CNA avers that since it was not disputing the validity of Derksen's proffered medical evidence, no review was required.

The Court finds this argument unavailing. <u>Moser</u> did not turn on whether there was a dispute over the validity of the medical evidence. Rather, the case turned on whether the claimant's own admissions undercut his claim of disability. An independent medical review is only required on appeal when the initial denial is based, at least in part, upon a medical judgment. 29 C.F.R. § 2560.503-1(h)(4).

Thus, the instant case can be distinguished from <u>Moser</u> because in this case, the initial and final denials were both based on medical judgments, and in <u>Moser</u> the decision was based on the claimant's statements.

The Regulations are clear. When faced with an appeal for a claim that was denied based on a medical judgment, review by an independent health care professional is required. Joye Kelley is not a health care professional, and thus CNA failed to provide this review. This is an egregious procedural irregularity that satisfies the first prong of the <u>Woo</u> test. In addition, this irregularity led to a serious breach of CNA's fiduciary duty to Derksen that satisfies the second prong of the <u>Woo</u> test. Without this independent evaluation, there was no full and fair review of Derksen's claim. This procedural irregularity and resulting breach of duty resulted in an arbitrary decision, that was based on the Plan administrator's whim.

### 5.   <u>Conclusion</u>

CNA's failure to (1) place Derksen on notice that it took issue with his treatment regimen, (2) properly address Derksen's claims under the Earnings Qualifier, and (3) have an independent health care professional review Derksen's claim on appeal were procedural irregularities that satisfied the first prong of the <u>Woo</u> test. Moreover, these irregularities caused CNA to breach its fiduciary duty to provide Derksen with a full and fair review of his claims, and resulted in an

27

arbitrary decision. Thus, a sliding scale standard of review is appropriate.

When a procedural irregularity existed during the administrative process, it is often appropriate to remand the case to the plan administrator for a decision on the merits, applying the rules established by the court. King v. Hartford Life & Accident Ins. Co., 414 F.3d 994, 1005 (8th Cir. 2005); Shelton v. Contigroup Co., Inc., 285 F.3d 640, 644 (8th Cir. 2002); Leonhardt v. Holden Bus. Forms Co., 828 F. Supp. 657, 669 (D. Minn. 1993). Remand is inappropriate, however,  when it would be futile. Id. The Court finds that a remand in this case would be futile. CNA has already denied Derksen a full and fair review of his case, in one instance by completely ignoring the Regulations, and the Court does not see the value in having the case wind its way through the administrative process once again. Thus, the Court will address the merits of the case.

### C.    Whether The Court Will Consider Evidence Outside the Administrative Record

When conducting a deferential review, a court usually cannot consider evidence outside the administrative record. See Brown v. Seitz Foods, Inc. Disability Benefit Plan, 140 F.3d 1198, 1200 (8th Cir. 1998). However, a court may admit additional evidence in an ERISA case if the proponent of the evidence shows good cause for the court to do so. Id. Proponents who had the opportunity and ability to provide the proffered evidence during the administrative process and failed to do so, do not meet the good cause standard. Id. at 1200-01. The

28

good cause standard applies even on de novo review. <u>Donatelli v. Home Ins. Co.</u>, 992 F.2d 763, 765 (8th Cir. 1993).

Derksen wants to submit four medical records and three affidavits that are not contained in the administrative record. CNA argues that Derksen has not provided good cause for admitting evidence outside the administrative record since Derksen had ample opportunity to submit most of the evidence he now proffers.

The Court finds that Derksen's failure to provide the records he now proffers is a direct result of CNA's failure to fully inform Derksen that his treatment plan was at issue and CNA's failure to properly address Derksen's claim under the Earnings Qualifier. Without proper notification about these two issues, Derksen did not know that his now-proffered evidence was necessary. This lack of notice constitutes good cause for failing to provide additional records. Thus, with one exception, the Court will consider evidence outside of the administrative record. The Court will not consider exhibit ARS 267-68. This two page document contains Dr. Beck's recollections of his conversation with Dr. Truchelut. As discussed above, CNA's initial denial put Derksen on notice that this conversation was at issue. Derksen had the opportunity to submit Dr. Beck's record regarding this conversation, but failed to do so. Thus, this document will not be considered during the Court's evaluation of Derksen's claims.

D.    **Whether CNA's Decision is Supported by the Administrative Record**

Under the deferential abuse of discretion standard of review, a plan administrator's decision will be upheld if it is supported by substantial evidence. See Delta Family-Care Disability & Survivorship Plan v. Marshall, 258 F.3d 834, 841 (8th Cir. 2001). Substantial evidence is "more than a scintilla but less than a preponderance." Sahulka v. Lucent Techs., Inc., 206 F.3d 763, 767-68 (8th Cir. 2000) (citation omitted). A determination should be upheld if the plan administrator's findings are reasonable, even if the court would have come to a different conclusion if conducting a de novo review. Delta Family-Care, 258 F.3d at 841 (citation omitted).

Under the sliding scale standard of review, the Court conducts an abuse of discretion analysis taking into consideration the conflict or procedural irregularity. Woo, 144 F.3d at 1161. Under this approach, the evidence supporting the benefit plan's decision must increase in proportion to the seriousness of the conflict or procedural irregularity.  Id. at 1162 (citation omitted). Due to CNA's serious procedural errors and resulting arbitrary decision, the Court will apply this sliding scale standard of review and will require that the record contain "substantial evidence bordering on a preponderance" in order to support CNA's denial of benefits. See Id.

1.    **Whether CNA Erred by Stating that Derksen Cannot Base a Disability Claim on a Desire to Avoid Future Complications**

CNA argues that a treatment regimen designed to avoid future complications is not a covered disability under the Plan because under the Occupation Qualifier, a claimant must prove that he is currently unable to perform his occupation. For support, CNA cites Leipzig v. AIG Life Ins. Co., 362 F.3d 406 (7th Cir. 2004). In Leipzig, the Seventh Circuit held that a claimant who had coronary artery disease, hypertension, and gout – all of which were well controlled with medication – was not entitled to ERISA benefits even though his physicians opined that he should not work in a high stress job because doing so could cause his health to worsen. 362 F.3d at 409.

CNA cites other nonbinding cases for the proposition that a claimant's "lifestyle choice" to reduce work hours to offset the risk of further complications does not justify an award of ERISA benefits. See Walsvick v. CUNA Mut. Ins. Soc., No. 03-C-637-C, 2004 WL 1354365, at *13 (W.D. Wis., June 14, 2004) (unpublished opinion); Grant v. Provident Life & Accident Ins. Co., No. 99-1329-CIV-MOORE, 2001 WL 1671028, at *8-9 (S.D. Fla. June 27, 2001) (unpublished opinion).

CNA further argues that Derksen is not disabled due to complications from his diabetes. Rather, according to CNA, the records demonstrate that Derksen's treatment regimen is designed to prevent long-term complications of the disease.

31

CNA cites <u>Coker v. Metropolitan Life Ins. Co.</u>, 281 F.3d 793 (8th Cir. 2002) for the proposition that an award of disability benefits cannot be based on the risk of developing a future disability, but rather has to be based on a current disability. In <u>Coker</u>, the Eighth Circuit found that an insurer's denial of benefits was appropriate in spite of the fact that both of the plaintiff's doctors stated that his condition would worsen if he returned to work. <u>Id.</u> at 799. Thus, according to CNA, since there is no objective evidence that Derksen currently has limitations that prevent him from performing his job duties, he is not disabled under the Plan.

The Court finds that neither denial notice addressed the issue of a current versus a future disability. Had Derksen been aware of these reasons for denial, he might have submitted more evidence – several of the documents Derksen now proffers support a finding of a then-current disability. CNA was obligated to provide clearly understood justifications for its denials, and this reason was not clearly articulated. Thus, this is an after-the-fact argument designed for purposes of litigation, and the Court will not consider this argument. <u>See</u> <u>Wuollet</u>, 360 F. Supp. 2d at 1010 n.13. Moreover, as discussed in the following sections, the record supports a finding of current disability.

### 2.    Whether CNA Should Have Considered the Effects of Necessary Treatment When Making its Decision

Derksen argues that CNA should have considered the effects of necessary treatment when determining disability. In its denial letter, CNA stated that

32

"treatment and a diagnosis do not constitute 'Disability'" under the Plan. (AR

060.) Derksen proffers cases decided under the ADA and the Minnesota Human

Rights Act ("MHRA") that hold that the effects of treatment for conditions that in

and of themselves are not disabling can constitute disability. In addition, Joe

Berlinderblau, an insurance broker involved in the decision for Derksen's

employer to purchase the CNA Plan, stated that he has never before heard of a

plan refusing to acknowledge that disabling treatment may constitute a disability.

(Berlinderblau Aff. ¶ 5.) CNA responds that ADA and MHRA cases have no

precedential value in ERISA litigation.

The Court agrees that ADA and MHRA decisions do not control this case.

However, the Eighth Circuit has concluded that under certain circumstances, the

side effects of treatment or medication can be disabling under ERISA. In <u>Torres v.</u>

<u>UNUM Life Ins. Co.</u>, the court found the claimant disabled under ERISA because,

<u>inter alia</u>, the side effects from his medication caused problems that prevented the

claimant from performing his job. 405 F.3d 670, 678, 680 (8th Cir. 2005). The

<u>Torres</u> court also noted that the demands of the claimant's job made it difficult for

the claimant to take his necessary medications on a regular basis. <u>Id.</u> at 680.

Moreover, the Eighth Circuit holds that under ERISA an improvement in a

claimant's condition because he leaves the position that disabled him in the first

place does not amount to evidence that a claimant has recovered the ability to

perform his former job. <u>Walke v. Group Long Term Disability Ins.</u>, 256 F.3d 835,

840-41 (8th Cir. 2001).

Thus, the Eighth Circuit recognizes that treatment can result in disability.

Given the rules enumerated in <u>Torres</u> and <u>Walke</u>, it was wrong for CNA to deny

Derksen's claim because disability does not include "treatment." Under the Plan,

"Disability" means satisfying either the Earnings Qualifier or the Occupational

Qualifier. Nowhere in the Plan is there language stating that treatments and their

side effects cannot constitute disability. Thus, interpreting the Plan to include this

requirement was wrong. <u>See</u> <u>Pralutsky</u>, 316 F. Supp. 2d at 850 (finding that a plan

may not require proof of disability not explicitly required by the plan language).

Moreover, since this language is not included in the Plan, and since the

purchasers of the Plan – Derksen and Berlinderblau, both experienced insurance

brokers – reasonably expected that disability resulting from treatment would be

covered, this was an improper reason for denying benefits. <u>See</u> <u>id.</u> (holding that

plans should be interpreted to conform to the legitimate expectations of

participants). Therefore, CNA's conclusion that treatment cannot constitute

disability is wrong.

Furthermore, CNA's conclusion that Derksen's diabetes and the side effects

of his treatment do not constitute severe impairments under the Plan is not

supported by evidence approaching a preponderance. Dr. Beck opined that

Derksen could not work more than 60% due to his disease and his treatments. Dr. Beck also stated that Derksen could not return to work full time because of the "intense" treatment for diabetes. (AR 254.) Dr. Beck further opined that the stress of Derksen's job was making the intensive treatments necessary, and that Derksen needed to cut back his hours to accommodate his therapy. In addition, meeting with clients is part of Derksen's job requirements, and Derksen has had to cut back on meetings because of his frequent testing and insulin dosing, both treatment-related activities. Thus, the record supports a finding of disability based on the side effects of treatment.

### 3. Whether Finding Derksen's Treatment Regimen "Self Imposed" Was a Valid Reason to Deny Benefits

CNA argues that its decision should be affirmed because Dr. Beck never actually prescribed Derksen's treatment plan. This was the crux of CNA's final denial letter. Derksen responds that no Plan provision excludes coverage for "self imposed" treatment.

Under the Plan, proof of disability must include proof of "appropriate regular care" from a doctor according to "generally accepted medical practice." (AR 020.) "Appropriate regular care" means that the claimant is visiting a doctor as often as required to meet his basic health needs. (AR 024.) "The effect of the care should be of demonstrable medical value." ( Id.) "Generally accepted medical practice" is defined as "care and treatment which is consistent with relevant

35

guidelines of national medical, research, and health care coverage organizations."
(AR 025.) The Plan does not mention "self imposed" treatments.

In this case, while some of the language in Dr. Beck's notes indicates that
Derksen initiated the intense treatment program, there is no denying that Dr.
Beck agreed with the regimen. In October 2002, Dr. Beck noted that Derksen was
working about sixty percent because he was unable to work full time and still
continue his intensive diabetes treatments. (AR 256.) In January 2003, Dr. Beck
stated that the stress of Derksen's job was causing a worsening of Derksen's
condition, and that he improved "dramatically" with a reduced work schedule and
frequent insulin dosing. (AR 0125.) A September 2003 medical record states that
at Dr. Beck's request Derksen was working half time "for his general health
benefit" and to prevent serious complications. (ARS 266.) Dr. Beck later opined
that Derksen was unable to remain in his current job and continue his current
testing regimen, a regimen Dr. Beck said was necessary to keep Derksen healthy.
(ARS 269-71; Beck Aff ¶ 15.)

In August 2003, Dr. Beck even explained why his previous notes did not
address the number of hours Derksen worked. (AR 209.) Dr. Beck stated that his
previous notes had only addressed Derksen's medical condition, not his disability
and work reduction. (Id.) Dr. Beck also noted that it was Derksen's lack of a
structured day that had necessitated Derksen's multi-testing regimen. (ARS 270-

71.)

There is also no denying that the care Derksen received had "demonstrable medical value." In January 2003, Dr. Beck noted that Derksen was unable to work full time, and that the change in Derksen's work schedule and intensive insulin dosing schedule had led to dramatic improvements in Derksen's health. (AR 125.) In August 2003, Dr. Beck stated that Derksen felt much better since cutting back from working sixty hours a week. (AR 208.) In his affidavit, Dr. Beck stated that Derksen did not achieve satisfactory control of his diabetes with a less intensive program, and that he finally achieved good control using the current treatment regimen. (Beck Aff. ¶ 15.)

Furthermore, under the terms of the Plan, Derksen had to prove his treatment plan was "consistent with relevant guidelines of national medical, research and health care coverage organizations." (AR 025.) Although Dr. Beck admitted that Derksen's treatment plan was not the normal standard of care (AR 104), he also stated that he tried traditional treatment routines, and that those treatments did not help Derksen. Derksen should not be penalized because he and his physician have developed a unique program for treating his diabetes. Moreover, although the frequency of testing and insulin dosing may be more than that required by a normal diabetic, this treatment regimen is not inconsistent with relevant guidelines of national medical, research and health care coverage

organizations. Derksen's treatment consists of testing his blood sugars and taking insulin, both standard treatments for diabetes.

Thus, the Court finds that Derksen's treatment regimen was not self-imposed. Dr. Beck encouraged this regimen. In addition, there is nothing in the Plan that specifically omits "self-imposed" treatments from coverage. To the extent that CNA relied on the Plan language requiring treatments to be "consistent with relevant guidelines of national medical, research, and health care coverage," the Court finds that although Derksen's treatment regimen is unique, it is not experimental or outside of relevant guidelines. Testing glucose levels and administering insulin are readily accepted treatments for diabetes. Accordingly, CNA's conclusions that Derksen's treatment was not the prescribed standard of care for his condition and that the treatment was not recommended by his physician are not supported by evidence approaching a preponderance. To the contrary, the record supports the conclusion that Dr. Beck approved of Derksen's treatment regimen, that the treatment was consistent with current medical guidelines, and that the treatment had demonstrable value – all of which satisfy the requirements of the Plan.

### 4.    Whether Derksen's Evidence Included Proper Medical Findings Under the Plan

ERISA cases are "very fact-oriented . . . . [and] laboratory tests or similar diagnostic procedures will not always be necessary to substantiate a claim of

disability, as certain disabling conditions are not susceptible to such objective evaluations." <u>Pralutsky</u>, 316 F. Supp. 2d at 850 (finding that claim of fibromyalgia could be substantiated by subjective evidence) (quoting <u>Brigham v. Sun Life of Canada</u>, 317 F.3d 72, 84 (1st Cir. 2003)).

CNA argues that its decision should be affirmed because Derksen failed to provide proper medical findings under the Plan. Under the Plan, to prove disability, Derksen needed to provide "objective medical findings which support [his] disability." (AR 020.) These include, but are not limited to "tests, procedures, or clinical examinations standardly accepted in the practice of medicine." (<u>Id.</u>) In addition, a claimant is required to provide proof that he is receiving care which meets the standards of "generally Accepted Medical Practice." (<u>Id.</u>)

While it is true that Derksen did not submit many tests and procedure results into evidence, these are not necessarily the standard ways that one monitors diabetes. Derksen did provide the clinical examination notes in the record, which often included a recital of his glucose numbers and a recital of Derksen's complaints and current condition. The notes contain Dr. Beck's detailed impressions and findings, including his impression that Derksen improved once he cut back his work schedule and adopted an intensive treatment regime. CNA does not state why these are insufficient evidence or why they are the wrong type of evidence. It would be odd if this kind of clinical visit evidence did not suffice

39

when it is the only type of evidence available. In addition, the Plan states that objective medical findings are not limited to certain types of documents. Therefore, CNA's argument is without merit.

Moreover, in its denial letters, CNA never stated that Derksen failed to provide proper medical findings to support his claim. The denials never invoked the "objective medical findings language." (AR 060-61; 097-99.) Thus, there is no reason that contemporaneous physician's notes should not suffice. To the extent that CNA is arguing that Derksen's intense treatment plan is not "standardly accepted," the Court has already found that the treatment regimen does employ standard treatment protocols tailored to Derksen's specific needs. Therefore, the Court finds that this argument is an inappropriate *post hoc* rational created for litigation purposes. In the alternative, the Court further finds that Derksen provided appropriate medical findings to support his claim. There is not evidence nearing a preponderance supporting CNA's conclusion on this issue. Rather, the medical evidence in the record supports a finding of a severe impairment. Derksen is unable to successfully treat his disease and work at the same time. There is no evidence to the contrary other than Dr. Truchelut's opinion, and the record shows that his conclusions were based, at least in part, on the fact that the treatment was self imposed. The Court has already found that self imposed treatment is not disallowed under the Plan, and that Dr. Beck approved of the treatment regimen.

40

**5.    Whether Any Doctor Restricted Derksen's Activities Such That Derksen Was Unable to Perform His Occupational Duties**

CNA argues that nothing in the record supports a finding that Derksen is unable to perform the material and substantial duties of his occupation because no doctor ever limited Derksen's activities and Derksen suffered no complications from diabetes. The Plan describes "substantial duties" as "the necessary functions of Your Regular Occupation which cannot be reasonably omitted or altered." The necessary functions of Derksen's job included driving, visiting clients, typing, and putting in sixty hour work weeks. (AR 098.) CNA concluded that the record does not "support an impairment in function that would have precluded [Derksen] from performing the substantial and material duties of [his] occupation." (Id.) CNA further argues that nothing in the administrative record states that Derksen had to cut his work days down from twelve hours to seven hours to accommodate his testing and insulin injections or that Derksen should even take so many injections.

CNA fails to note that Dr. Beck stated that Derksen was able to do only "60% work," and stated that a reduction in hours would be "more appropriate" for Derksen. Moreover, even though Dr. Beck admitted that Derksen is able to perform his insurance broker duties with his condition, Dr. Beck also stated that he could not perform these duties sixty hours a week and still maintain good

41

control of his diabetes. (AR 104, 208, 254, 256; Beck Aff. ¶ 15; Beck Suppl. Aff. ¶¶ 3-4.) Working sixty hours a week is one of the duties of Derksen's job. Dr. Beck also stated that there was a need for Derksen to cut back to half time and that the stress of Derksen's job contributed to his condition. (AR 123.) Dr. Beck further opined that Derksen needed to continue his intensive treatment regimen in order to control his diabetes. (Beck Aff. ¶ 15.) The only evidence to the contrary is Dr. Truchelut's impression. The majority of the evidence supports a finding that Derksen cannot successfully treat his condition and perform his insurance broker duties. Thus, CNA's conclusion is not supported by the record.

### 6.   Whether Derksen Satisfies the Earnings Qualifier

CNA denied Derksen a proper review under the Earnings Qualifier, the qualifier under which Derksen first filed his claim for LTD benefits. The Court finds that Derksen satisfies the requirements under the Earnings Qualifier.

The only evidence in the record supporting a conclusion that Derksen does not satisfy the Earnings Qualifier is Dr. Truchelut's statement that Dr. Beck said that Derksen could perform the requirements of his job. However, this statement, even when considered in the light most favorable to CNA, is not at odds with a finding of disability. Under the Earnings Qualifier, Derksen can work and still collect benefits. In fact, when the Plan states that to satisfy the Earnings Qualifier, a claimant must be "unable to earn more than 80% of [his] Monthly Earnings,"

CNA obviously assumes claimants will be able to perform some work. Dr. Beck

specifically states that Derksen has suffered a loss of earnings, and Derksen has

provided other uncontroverted evidence of his decline in income. (AR 0123,

0176-203.) There is no evidence in the record stating that Derksen did not suffer a

loss of income of more than twenty percent. Moreover, as discussed above, CNA's

argument that Derksen does not meet the threshold requirement of having a

severe impairment is not supported by the record.

Therefore, the Court finds that CNA's decision to deny Derksen LTD

benefits is not supported by the evidence. Rather, the record as a whole supports a

finding that Derksen has met the Earnings Qualifier contained in the Plan and is

entitled to LTD benefits.

### E.    The Amount of Benefits to Which Derksen is Entitled

Derksen seeks past due disability benefits and prejudgment interest;

reinstatement as a Plan participant, entitled to both current and future benefits;

and a trial on the matter of the amount of benefits to be awarded in this case.

CNA responds that Derksen is not allowed to obtain an injunction requiring CNA

to pay Derksen future benefits. Rather, if the Court determines that CNA abused

its discretion, any award of benefits should be consistent with the terms and

conditions of the Plan insofar as an award would be premised on Derksen's

providing proof of continuing disability and financial losses as the required by the Plan.

29 U.S.C. § 1132 provides, in pertinent part, that an ERISA plan beneficiary may bring a civil action to "recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Thus, any award of benefits must be governed by the terms of the Plan. Under the Plan, Derksen has an obligation to provide proof of continuing disability. (AR 020.) The Plan administrator reserves the right to demand this continuing proof and the right to demand that Derksen submit to medical examinations or risk losing his benefits. (Id.) Thus, Derksen's blanket request for future benefits is denied. The Plan is under no obligation to provide benefits into perpetuity in the absence of the required proof. The Court further finds that a trial on the issue of damages is not necessary. The Court can decide the appropriate damages award based on briefing.

Lastly, although Derksen briefed the issue of attorney's fees, his proposed order states that once a trial on the issue of damages is concluded, Derksen should have the opportunity to file a motion for attorney's fees. The Court finds that a decision on attorney's fees at this juncture would be premature. Therefore, the Parties must also brief the issue of attorney's fees.

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.      Plaintiff's Motion for Summary Judgment [Doc. No. 50] is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a)      Plaintiff's Motion is **GRANTED** as to an award of past benefits and prejudgment interest;

      b)      Plaintiff's Motion is **GRANTED** as to reinstatement in Defendant's long-term disability plan;

      c)      Plaintiff's Motion is **GRANTED** as to an award of future benefits with continuing proof of disability under the terms of the Plan; and

      d)      Plaintiff's Motion is **DENIED** as to an award of future benefits without continuing proof of disability under the terms of the Plan;

2.      Plaintiff's request for attorney's fees is **CONTINUED** pending briefing;

3.      Defendant shall reinstate Plaintiff in its long-term disability plan;

4.      Defendant's Motion for Summary Judgment [Doc. No. 58] is **DENIED**;

5.      On or before December 9, 2005, Plaintiff shall file a submission addressing the calculation of benefits due under the Plan. In this submission, Plaintiff may also move for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). Plaintiff's brief shall not exceed fifteen (15) pages; and

6.      On or before January 9, 2006, Defendant shall file a response addressing the issues raised in Plaintiff's submission. Defendant's brief shall not exceed fifteen (15) pages.

Dated: November 08, 2005               s/ Michael J. Davis
                                        Michael J. Davis
                                        UNITED STATES DISTRICT COURT