**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**DEWAYNE DERKSEN,**

        **Plaintiff,**

v.                                                                    **MEMORANDUM OF LAW**
                                                                      **AND ORDER**
                                                                      **Civil No. 04-3411 (MJD/SRN)**

**CNA GROUP LIFE ASSURANCE**
**COMPANY, and its Successors,**

        **Defendants.**

David W. Larson, Martin & Squires, Counsel for Plaintiff.

Doreen A. Moths, Rider Bennett, LLP, Counsel for Defendants.

## I.   INTRODUCTION

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1101, et seq.  Specifically, Plaintiff Derksen's claim was brought under 29 U.S.C. § 1132 and sought benefits under the plan at issue and an injunction to reinstate Derksen's long-term disability ("LTD") policy with Defendant CNA Insurance.  For a review of the relevant facts, see the Court's November 8, 2005 Order [Doc. No. 84].

1

In that Order, this Court granted Derksen's motion for summary judgment in part, concluding that Derksen was entitled to an award of disability benefits under his employer's LTD plan.  This matter is now before the Court on Derksen's application for benefits and attorneys fees.  Briefing is complete, and based on the Parties' submissions and the record as a whole, the Court awards Derksen $37,722.31 in past-due benefits and $70,828.71 in attorneys fees and costs.

## II.     DISCUSSION

### A.     Calculation of Benefits Due

#### 1.     Relevant Plan Terms

Derksen applied for LTD benefits in June 2003, stating that he was disabled due to his diabetes and that he qualified for LTD benefits under the Earnings Qualifier contained in his company's LTD plan ("The Plan") which provides the following:

> Under the Earnings Qualifier, a Plan participant may be considered disabled . . . in any month in which You are Gainfully Employed, if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that You are unable to earn more than 80% of Your Monthly Earnings in any occupation for which You are qualified by education, training or experience.  On each anniversary of Your Disability, We will increase the Monthly Earnings by the lesser of the current annual percentage increase in the CPI-W, or 10%.

(AR 008) (emphasis omitted).  The Plan defines "gainfully employed" in the following way:

>Gainful Employment or Gainfully Employed means the performance of any occupation for wages, remuneration or profit, for which You are qualified by education, training or experience on a full-time or part-time basis, for the Employer or another employer, and which We approve and for which We reserve the right to modify approval in the future.

(AR 024) (emphasis omitted).

Monthly Earnings "equals the monthly wage or salary that You were receiving from Your Employer on the Date of Disability. It includes . . . commissions averaged over the preceding 12-month period or length of employment if less; and [ ] bonuses averaged over the preceding 36-month period or length of employment if less." (AR 010.) Disability Earnings are "the wage or salary You earn from Gainful Employment after a Disability begins." (AR 024.) Defendant CNA will calculate a Plan participant's net long-term disability in the following way:

>1) Multiply Your Monthly Earnings by 60%.
>2) The maximum Gross LTD Monthly Benefit is $20,000.
>3) Compare the answers from Item 1 and Item 2. The lesser of these two amounts is Your Gross LTD Monthly Benefit.
>4) Subtract the Deductible Sources of Income from Your Gross LTD Monthly Benefit. The resulting figure is Your Net LTD Monthly Benefit.

(AR 010.)

## 2.     Method of Calculating Benefits

Because Derksen continued to earn income from his profession after the onset of his disability, the appropriate calculation of benefits is set forth under the Plan's "Work Incentive Benefit" which provides that during the first twenty-four months of Gainful Employment, the benefit will be calculated as follows:

1) The Net LTD Monthly Benefit amount and Disability Earnings amount will be added together and compared to Monthly Earnings.
2) If the total amount in Item 1 exceeds 100% of Monthly Earnings, the Work Incentive Benefit amount will be equal to the Net LTD Monthly Benefit amount reduced by the amount of the excess.
3) If the total amount in Item 1 does not exceed 100% of Monthly Earnings, the Work Incentive Benefit will be equal to the Net LTD Monthly Benefit amount.

After the first 24 months of Gainful Employment, the Work Incentive Benefit will be equal to the Net LTD Monthly Benefit amount less 50% of Disability Earnings.

The Work Incentive Benefit will cease on the earliest of the following:
   1. the date You are no longer Disabled; or
   2. the end of the Maximum Period Payable.

(AR 011) (emphasis omitted). Derksen's Maximum Period Payable ends in approximately three years, on his sixty-sixth birthday. (AR 005.)

Derksen met the claim trigger under the Earnings Qualifier in June 2003 when his earnings were reduced by at least twenty percent due to his diabetes. There is a ninety-day elimination period, and therefore Derksen was not entitled to

benefits for June, July, or August 2003. During the times when Derksen qualifies for benefits, he is not required to pay premiums. (AR 007.)

### 3. Derksen's Arguments

Derksen argues that he has proven he is entitled to benefits through December 2005 because he was "gainfully employed" during that time. Specifically, Derksen argues that he continues to work under a modified contract with Associated Financial Group ("AFG"). For support, Derksen submits a 2005 W-2 form that indicates that Derksen earned $7,802.63 in 2005. Derksen further alleges that his "high performer" payouts are not bonuses, but rather are commissions, and that he is entitled to reimbursement for the premiums he paid in 2003 and 2004 since the Court has determined that he is entitled to benefits beginning in June 2003. Derksen further avers that he is entitled to a yearly cost of living increase in benefits based on the CPI-W in June 2004 and June 2005. Derksen also requests prejudgment interest on his benefits.

### 4. Analysis

There is no dispute that Derksen was gainfully employed through August 31, 2004. At that time, Derksen ceased being an employee of AFG. (Franklin Aff. ¶ 3.) Notwithstanding this fact, Derksen argues that he has continued to earn wages from AFG under a modified contract. (Pl. Reply ¶ I.) However, there is no evidence that this subsequent employment was "gainful employment" under the

Plan or that it was approved by CNA, something that is required under the Plan. (AR 024.) The Court was clear in its November 8, 2005 Order that Derksen would need to continue qualifying for benefits under the Plan, and that the Court would not award benefits into perpetuity. Therefore, the Court will now decide what benefits are due to Derksen for the period from June 2003 through August 2004. The case is remanded to the Plan Administrator for a determination as to whether Derksen was gainfully employed under the Plan after August 2004 and as to whether an award of benefits is appropriate for this time period.

### a. Monthly Earnings

The Parties dispute the amount of Average Monthly Earnings that should be used to calculate Derksen's monthly benefit under the Plan. The discrepancy occurs because the Parties proffer differing amounts for Derksen's February 2003 commissions. Derksen states that he earned $29,278 in commissions in February 2003. (Berlinderblau Aff. Ex A.) CNA avers that Derksen earned $22,475.03 in February 2003.[1] This discrepancy arises because Derksen includes a separate $6,803 payment in his February 2003 commission. Derksen characterizes this as a "high performer commission," and CNA characterizes it as a "bonus." (Derksen

---

[1] In addition to this disagreement, the Parties also calculate Derksen's monthly earnings differently – Derksen rounds monthly earnings figures up or down to the nearest dollar, and CNA uses dollars and cents in its calculations.

Aff. ¶ 3; Bristol Aff. ¶ 6.) Derksen argues that this is not a bonus because awarding this money is not discretionary with CNA. Rather, Derksen asserts that high performer payments are automatically awarded based on a rigid formula.

The Plan does not define "bonus." However, as discussed above, it does make a distinction between commissions and bonuses in its calculation of Monthly Earnings. (AR 010.) The Court is troubled by Derksen's insistence that the February 2003 payout was not a bonus. Lynn Franklin, an accountant at AFG, called the February payout a "bonus," and AFG did not include this payment in Derksen's "commissions earned." (AR 176; 225-27.)

"When the language of an insurance contract is unambiguous, the language should be accorded its plain and ordinary meaning." Ill. Farmers Ins. Co. v. Glass Serv. Co., 683 N.W.2d 792, 799 (Minn. 2004) (citation omitted). The plain and ordinary meaning of "bonus" is "something in addition to what is expected or strictly due: . . . money or an equivalent given in addition to an employee's usual compensation." Merriam-Webster's Collegiate Dictionary 131 (10th ed. 1999). This definition is in concert with the Plan terms that treat commissions and bonuses differently. Therefore, the Court finds that CNA's interpretation of "bonus" is correct. The $6,803 Derksen earned in February 2003 must be considered a bonus under the Plan, rather than a commission. Therefore, the Court adopts CNA's calculation of Derksen's pre-disability monthly earnings:

| | |
|---|---|
| June 2002 | $ 16,423.72 |
| July 2002 | $ 18,215.06 |
| August 2002 | $ 17,200.49 |
| September 2002 | $ 15,883.15 |
| October 2002 | $  9,968.45 |
| November 2002 | $ 17,958.16 |
| December 2002 | $ 20,415.94 |
| January 2003 | $ 17,640.86 |
| February 2003 | $ 22,475.03 |
| March 2003 | $ 11,372.26 |
| April 2003 | $ 35,805.00 |
| May 2003 | $ 15,957.68 |
| **Total Commissions For Prior 12 Months** | **$ 219,315.80** |
| **Average Monthly Commissions** | **$ 18,276.32** |
| Documented Bonuses For Prior 36 Months | $ 6,803.00 |
| **Average Monthly Bonuses** | **$ 188.97** |
| **Total Average Monthly Earnings** | **$ 18,465.29** |

Based on the above figures, Derksen's Net LTD monthly benefit is $11,079.17, which is sixty percent of his total average monthly earnings. (AR 005.)

### b. Cost-of-Living Increase

The Plan provides that "[o]n each anniversary of Your Disability, We will increase the Monthly Earnings by the lesser of the current annual percentage increase in the CPI-W, or 10%." (AR 008.) Derksen argues that under this

provision, there is an automatic cost-of-living increase on the anniversary of disability onset, in June of each year after 2003.

Derksen misconstrues the Plan. The plain meaning does not indicate a cost-of-living-increase in monthly benefit. The Plan clearly states that the "Monthly Earnings" will be increased, not the "Monthly Benefit." This is unambiguous and the Plan defines each term differently. Therefore, no cost-of-living increase will be included in the Court's benefits calculation. Pursuant to the Plan, however, the Court will include an increase in monthly earnings beginning in June 2004 based on the annual CPI-W of 2.2%. The Court notes that additional briefing was solicited on this issue, and after consideration of the Parties' submissions, the Court has adopted the CPI-W proffered by CNA.

### c. Calculation of Benefits

For the period of June 2003 through August 2004, the Parties agree that benefits should only be awarded for the months of October and November 2003; and January, March, April, and June 2004 because Derksen was not entitled to benefits for the three month elimination period beginning in June 2003 and because Derksen earned more than eighty percent of monthly earnings in the other months during this period. As discussed above, Derksen bases his figures on a faulty monthly earnings calculation and a faulty monthly benefit calculation that includes a cost of living increase after June 2004. The Court has reviewed the

Parties' figures and concludes that the figures submitted by CNA are correct. Therefore, Derksen is awarded $37,722.31 in Work Incentive Benefits for the period from June 2003 through August 2004.

In the Court's discretion, prejudgment interest may also be awarded under 29 U.S.C. § 1132(a)(3)(B). <u>Seitz v. Metro. Life Ins. Co.</u>, 433 F.3d 647, 652 (8th Cir. 2006). CNA does not oppose an award of prejudgment interest, and since CNA's denial of benefits was wrong, prejudgment interest through August 2004 is appropriate as equitable relief. <u>Id.</u> Prejudgment interest is thus awarded on the amount of past-due benefits at the rate Derksen requests in his petition. As discussed above, the Plan will need to decide, consistent with the Court's orders, whether Derksen continued to qualify for benefits after August 2004.

### B.   **Reimbursement for Premium Payments**

Derksen was not required to pay insurance premiums during any period that he was receiving LTD monthly benefits. (AR 007.) Derksen paid $442.80 in premiums in 2003 and $316.18 in premiums from January through August 2004, which apparently was half the total premiums. (Derksen Aff. Ex. A.)[2] AFG paid identical premium amounts on behalf of Derksen. Derksen originally argued that

---

[2] Derksen actually asserts that he paid $517.00 in 2003 and $632 in 2004 (Derksen Aff. ¶ 5), but the exhibit he cites to support this conclusion supports the numbers the Court uses above.

he was entitled to reimbursement for the total premiums paid in 2003 and 2004, but now argues that he is entitled to reimbursement for only the premiums he paid and that CNA should reimburse AFG for the other half of the premiums. (Pl. Reply ¶ V.)

Derksen seems to be arguing that he is entitled to reimbursement for all the premiums he paid during 2003 and 2004. However, the Plan provides that Derksen is only entitled to reimbursement for the months during which he received benefits. Without guidance from the Parties, the Court is left to assume that the total premiums paid each year should be divided by the number of months that premiums were paid to get the amount of the monthly premium. Therefore, Derksen's 2003 monthly premium was $36.90 ($442.80 ÷ 12), and Derksen's 2004 monthly premium was $39.52 ($316.18 ÷ 8). Derksen should be reimbursed $73.80 for premiums paid in October and November 2003; and $158.08 for premiums paid in January, March, April, and June 2004.[3]

## C. **Attorneys Fees and Costs**

Derksen argues that he is entitled to costs and attorneys fees under the analysis articulated in <u>Lawrence v. Westerhaus</u>, 749 F.2d 494 (8th Cir. 1984). Specifically, Derksen seeks $108,802 in attorney and paralegal fees, and $1,876.21

---

[3]The Court agrees with CNA that Derksen does not have standing to demand reimbursement on behalf of AFG. (Def. Sur-reply ¶ V.)

in costs. Lawrence provides a nonexclusive list of factors courts may consider when deciding whether to award attorneys fees in ERISA cases. See Martin v. Ark. Blue Cross & Blue Shield, 299 F.3d 966, 972 (8th Cir. 2002). The Lawrence factors include the following:

(1) the degree of the opposing parties' culpability or bad faith;
(2) the ability of the opposing parties to satisfy an award of attorneys' fees;
(3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances;
(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal [question] regarding ERISA itself; and
(5) the relative merits of the parties' positions.

749 F.2d at 496 (citation omitted). The decision to award attorneys fees is discretionary. Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1329 (8th Cir. 1995) (citation omitted). The factors are to be considered along with other relevant factors and guidelines regarding awards of attorney fees. Martin, 299 F.3d at 972.

The Court has considered the Parties' arguments and concludes that an award of fees is appropriate in this case. First, CNA ignored the minimum protections required under ERISA by relying on a Plan disability trigger that did not apply, and by refusing to acknowledge that treatment can result in disability. Moreover, CNA completely ignored relevant regulations when it had the same doctor review the case on appeal as had rendered the initial negative findings.

12

Second, it is obvious that CNA, now part of The Hartford, is a multibillion dollar corporation with the ability to pay a fee award.  (Larson Aff. Ex. G.)  Third, an award of fees would deter CNA from ignoring ERISA procedural requirements in the future.

Although CNA argues that an award of fees would not have a deterrent effect in this case since Derksen's illness is "unique," the Court does not find that fact dispositive.  Derksen's diabetes was not the problem; CNA's failure to provide Derksen with appropriate procedural protections was the problem.  An award of fees will hopefully cause CNA to follow established rules and procedures in the future.

Fourth, this action will help all benefit plan participants because the Eighth Circuit has not yet interpreted the 2002 regulations requiring an independent medical evaluation on appeal, and bringing this issue to the forefront will help settle the issue in this Circuit.  Fifth, the Court has found that the merits of the case favor Derksen.  Therefore, an award of fees is appropriate in this case.  The only question remaining is the amount of fees to which Derksen is entitled.

The Court must now use a lodestar formula to determine the amount of fees that will be awarded.  See Brown v. Aventis Pharm., Inc., 341 F.3d 822, 829 (8th Cir. 2003).  In determining a reasonable fee, the Court may, but is not required to, consider the following factors:

     (1)    the time and labor required;
     (2)    the novelty and difficulty of the question;
     (3)    the skill requisite to perform the legal service properly;

     (4)    the preclusion of employment by the attorney due to acceptance of the case;
     (5)    the customary fee;
     (6)    whether the fee is fixed or contingent;
     (7)    time limitations imposed by the client or the circumstances;
     (8)    the amount involved and the results obtained;
     (9)    the experience, reputation and ability of the attorney;
    (10)    the "undesirability" of the case;
    (11)    the nature and length of the professional relationship with the client; and
    (12)    awards in similar cases.

Hensley v. Eckhart, 461 U.S. 424, 430 n.3 (1983).

Derksen's counsel ("Counsel") expended 402.4 hours at rates of $225 and $250 an hour working on this case.  (Larson Aff. ¶ 9.)  Counsel's associate billed 30 hours at a rate of $165 an hour.  (Id.)  In addition, a paralegal in Counsel's firm worked for 8.4 hours at a rate of $75 an hour.  (Id.)  This results in total fees of $102,452.50.  (Id. ¶ 10.)  Counsel also seeks reimbursement for $1,876.21 in costs.  (Id.)  Counsel further states that he incurred $6,350 in fees associated with the instant petition for benefits and fees.  (Id. ¶ 11.)  Counsel did not take Derksen's case on a contingency basis.  Rather, Derksen paid his bills until he could no longer do so.  Derksen has paid Counsel approximately $59,000 so far.

CNA takes issue with the number of hours for which Counsel seeks reimbursement.  Specifically, CNA avers that Counsel is expecting reimbursement

for the time it took him to learn ERISA law, for time associated with briefing and arguing unsuccessful motions, and for briefing issues that were conceded on the day of oral argument.  Counsel responds that his hours are not excessive because CNA's attorneys refused to participate in settlement negotiations or discovery, resulting in extensive briefing of a motion to compel which was eventually appealed to this Court from the Magistrate's order, and because of the extensive briefing required on the Parties' cross motions for summary judgment.

The Court finds that the hourly rates charged by Counsel and others working with him are reasonable.  The fee applications cited by Counsel and the Court's experience both support the finding that these are reasonable rates for attorneys with Counsel's experience in this market.  See McDonald v. Armontrout, 860 F.2d 1456, 1459 (8th Cir. 1988) (reasoning that an attorney's ordinary billing rate is not conclusively reasonable, but rather should be compared to the usual and customary fee for similar work in the community).

The Court further finds, however, that the number of hours for which Counsel seeks payment is excessive.  The number of hours Counsel claims to have worked is much larger than the number of hours worked in any of the cases Derksen cites.  Although Derksen's treatment regimen is unique, there is nothing unique about this ERISA case.  A straight-forward appeal from a denial of

CASE 0:04-cv-03411-MJD-SRN   Document 109   Filed 07/07/06   Page 16 of 18

disability benefits is the type of ERISA case the Court sees most often.  See Antolik v. Saks Inc., 407 F. Supp.2d 1064, 1075 (S.D. Iowa 2006) (explaining that reviews of plan administrators' decisions are the most commonly litigated ERISA cases).

Moreover, "a reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." Geissal v. Moore Med. Corp., 338 F.3d 926, 936 (8th Cir. 2003) (quoting Hensley v. Eckhart, 461 U.S. 424, 440 (1983)).  In this case, Derksen sought benefits into perpetuity and the Court denied that request.  Consistent with the terms of the Plan, Derksen must continue to prove he is disabled and entitled to benefits, something Derksen strongly argued against.

Counsel's billing records make it difficult to decipher whether research and other work was duplicative.  Counsel's method of "block explanation" often lacks specificity and makes it difficult for the Court to know if the time expended on any specific task was reasonable.  In addition, the billing record contains several notions such as "[c]onference with DeWayne," "Continue research," and "emails with DeWayne" which are not helpful to the Court in making its decision regarding the reasonableness of these fees.

In the Court's experience with ERISA cases, the number of hours Counsel claims to have worked on this case is very unreasonable.  While it is true that this

16

case involved a motion to compel and cross motions for summary judgment, neither of those motions was unique in any way, in spite of the Court's finding that Derksen's treatment plan was unique. Motions to compel based on relevance are the bread and butter of discovery practice, and cross motions for summary judgment are the norm in ERISA benefits cases. Therefore, the Court finds that Counsel's hours should be reduced by one third. The Court will deduct hours at a rate of $250 per hour because that is the rate Counsel charged for the majority of his work. Given the size of the resulting fee award and given the routine nature of this case, the Court declines to award Derksen the additional $6,350 he seeks for preparing this petition. Therefore, under the new lodestar calculation, Derksen is awarded fees for Counsel's work based on the following calculation:

| | | |
|---|---|---|
| 149.1 hours x $225 | = | $33,547.50 |
| 119.3 hours x $250 | = | $29,825.00 |
| **Total for Counsel Larson** | | **$63,372.50** |

CNA does not take issue with the number of hours billed by either Attorney Dawn Knutson or Counsel's paralegal, or with the costs Derksen requests, and the Court agrees that these costs and fees are reasonable. Therefore, Derksen's figures relating to these billing categories will be adopted by the Court.

| | |
|---|---|
| **Total for Counsel Knutson** | **$ 4,950.00** |
| **Total for Paralegal Time** | **$   630.00** |

| | |
|---|---|
| **Total Costs** | **$ 1,876.21** |
| **TOTAL COSTS AND FEES** | **$70,828.71** |

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

(1) Plaintiff is awarded $37,722.31 in long-term disability benefits for the period from June 2003 through August 2004;

(2) Plaintiff is awarded pre-judgment interest on this amount to be calculated using Plaintiff's formula;

(3) Plaintiff must prove entitlement to additional benefits pursuant to the Plan for the time period beginning after August 2004;

(4) Plaintiff is awarded $231.88 in insurance premium reimbursements;

(5) Plaintiff is awarded $70,828.71 in costs and fees associated with this litigation; and

(6) Defendant shall tender the above amounts within thirty (30) days of this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 6, 2006

s / Michael J. Davis<br>
Michael J. Davis<br>
United States District Court